J-S01016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.S., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: Y.G., MOTHER | : | |
| | : | |
| | : | No. 1418 MDA 2024 |

Appeal from the Decree Entered August 30, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88819

| | | |
|---|---|---|
| IN RE: Y.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: Y.G., MOTHER | : | |
| | : | |
| | : | No. 1419 MDA 2024 |

Appeal from the Decree Entered August 30, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88820

BEFORE:   NICHOLS, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                    **FILED: FEBRUARY 14, 2025**

Appellant, Y.G. ("Mother"), appeals from the decrees entered in the Berks County Court of Common Pleas, Orphans' Court, which granted the petitions of Berks County Children and Youth Services ("CYS") for involuntary termination of Mother's parental rights to her minor children, A.S., Jr. (born

_____

[*] Former Justice specially assigned to the Superior Court.

in November 2015), and Y.S. (born in September 2017) (collectively, "Children").[1] We affirm and grant counsel's petition to withdraw.

The Orphans' Court accurately and thoroughly set forth the relevant facts and procedural history of this case. Therefore, we have no reason to restate them at length. (*See* Orphans' Court Opinion, filed 8/30/24, at 2-27). Briefly, Mother has a long history with CYS as both a child and a parent. Mother first became known to CYS as a parent in 2013, due to concerns regarding her parenting skills, domestic violence, substance abuse, and unstable housing relating to an older child, J.C. (born in April 2007).[2]

On January 5, 2022, CYS filed dependency petitions regarding Children after allegations of abuse, neglect, and domestic violence in the home. On January 19, 2022, CYS sought emergency custody of Children after learning that Mother's then-paramour had physically abused A.S. That same day, the court granted emergency custody to CYS.

On January 26, 2022, following a dependency hearing, the court adjudicated Children dependent and transferred legal and physical custody to CYS. The court ordered Mother to 1) participate in casework services; 2) participate in parenting education; 3) submit to a mental health evaluation and follow any recommendations; 4) submit to a drug and alcohol evaluation;

---

[1] The court also terminated the parental rights of A.S., Sr. ("Father"). Father is not a party to this appeal.

[2] J.C. currently resides in Georgia in a permanent placement and is not involved in the current action.

5) maintain stable housing and income; 6) sign releases for certain information; and 7) participate in scheduled visitation. Subsequently, the court engaged in status hearings as Mother unsuccessfully participated in attempts to reunify with Children.

On February 6, 2024, CYS filed petitions seeking the involuntary termination of Mother's and Father's parental rights. The court held hearings on the petitions on July 17, 2024, and August 19, 2024, at which the court heard the testimony of sixteen CYS witnesses, as well as the testimony of Mother. On August 30, 2024, the Orphans' Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).

On September 26, 2024, Mother timely filed notices of appeal at each underlying docket and contemporaneous concise statements of errors complained of on appeal. This Court consolidated Mother's appeals *sua sponte* on October 21, 2024. On November 22, 2024, Mother's counsel filed an **Anders**[3] brief and application to withdraw in this Court.

As a preliminary matter, counsel seeks to withdraw her representation pursuant to **Anders** and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009). **Anders** and **Santiago** require counsel to: (1) petition the Court for leave to withdraw, certifying that after a thorough review of the record, counsel has concluded the issues to be raised are wholly frivolous; (2) file a brief referring to anything in the record that might arguably support the

---

[3] **Anders v. California**, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

appeal; and (3) furnish a copy of the brief to the appellant and advise her of her right to obtain new counsel or file a *pro se* brief to raise any additional points the appellant deems worthy of review. ***Santiago, supra*** at 173-79, 978 A.2d at 358-61. Substantial compliance with these requirements is sufficient. ***Commonwealth v. Wrecks***, 934 A.2d 1287, 1290 (Pa.Super. 2007). After establishing that counsel has met the antecedent requirements to withdraw, this Court makes an independent review of the record to confirm that the appeal is wholly frivolous. ***Commonwealth v. Palm***, 903 A.2d 1244, 1246 (Pa.Super. 2006). ***See also Commonwealth v. Dempster***, 187 A.3d 266 (Pa.Super. 2018) (*en banc*).

In ***Santiago, supra***, our Supreme Court addressed the briefing requirements where court-appointed appellate counsel seeks to withdraw representation:

> Neither ***Anders*** nor [***Commonwealth v. McClendon***, 495 Pa. 467, 434 A.2d 1185 (1981)] requires that counsel's brief provide an argument of any sort, let alone the type of argument that counsel develops in a merits brief. To repeat, what the brief must provide under ***Anders*** are references to anything in the record that might arguably support the appeal.
>
> *    *    *
>
> Under ***Anders***, the right to counsel is vindicated by counsel's examination and assessment of the record and counsel's references to anything in the record that arguably supports the appeal.

***Santiago, supra*** at 176, 177, 978 A.2d at 359, 360. Thus, the Court held:

> [I]n the ***Anders*** brief that accompanies court-appointed

- 4 -

counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* at 178-79, 978 A.2d at 361. *See also In re J.D.H.*, 171 A.3d 903, 905-06 (Pa.Super. 2017) and *In re V.E.*, 611 A.2d 1267, 1275 (Pa.Super. 1992) (explaining that *Anders* procedure applies in appeals from termination of parental rights and goal change orders).

Instantly, Mother's counsel filed a petition to withdraw and an *Anders* brief. Counsel claims to have conducted a conscientious review of the record and determined the appeal is wholly frivolous. Counsel supplied Mother with a copy of the brief and a letter explaining Mother's rights to retain new counsel or to proceed *pro se.* In the brief, counsel provides a summary of the facts and procedural history of the case. Counsel's argument refers to relevant law that might arguably support Mother's issues. Counsel further states the reasons for her conclusion that the appeal is wholly frivolous. Thus, counsel has substantially complied with the requirements of *Anders* and *Santiago*. *See Wrecks, supra*.

Counsel raises the following issues on Mother's behalf:

Whether counsel for [Mother] met the requirements of *Anders v. California* and *Commonwealth v. Santiago*?

Whether the [Orphans' Court] abused its discretion when it involuntarily terminated [Mother's] parental rights under

- 5 -

the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8)?

Whether the [Orphans' Court] abused its discretion when it involuntarily terminated [Mother's] rights pursuant to Section 2511(b)?

(**Anders** Brief at 4).

After a thorough review of the record, the briefs of the parties, and the applicable law, we conclude that Mother's issues merit no relief based on the reasoning set forth in the Orphans' Court's thorough and well-reasoned opinion. (**See** Orphans' Court Opinion at 28-24).

Specifically, the court noted that while Mother appears to care for her Children and has demonstrated "a nominal effort to comply" with services and complete her reunification objectives, she has not shown the ability or sincere desire to remedy the conditions leading to the removal of Children, or to fully appreciate the needs of Children. (**See id.** at 32). The court observed that Mother has a long history of relationships with violent men who abuse her and Children, which she then attempts to hide from CYS, and that Mother's inappropriate parenting combined with her ongoing toxic relationships favors termination. (**Id.**).

The court noted that both Children were molested by older children during Mother's custodial time and as a result, A.S. exhibits sexualized behaviors and aggression, and Mother appears to lack insight into the severity of the situation. (**Id.** at 18-19, 27). While A.S. has made progress in therapy and foster care, he regresses after seeing Mother and shows an increase in use of racial slurs, aggression and sexual behaviors. (**Id.** at 18-19, 21). Both

Children dealt with significant anxiety before visits, wondering whether Mother would even attend, and would blame themselves if she canceled. (*Id.* at 20).

Further, the court opined that the emotional bond between Mother and Children is virtually non-existent, and Children do not look to her to meet their needs. (*Id.* at 32). Although Children have stated throughout the years that they love Mother and want to protect her, they "struggle with the idea of their needs being met" by her.[4] (*Id.* at 25). Y.S. would like to be adopted by his resource family, where he is "doing amazing," and A.S. would also like to stay with his resource family. (*Id.* at 21-24). Children's caseworker did not believe that terminating Mother's parental rights would be a detriment to either child. (*Id.* at 25).

The court credited the exhaustive testimony and evidence presented by CYS' sixteen witnesses and emphasized that Mother continually failed to accept accountability for her actions, more than two years after Children's initial placement. (*Id.* at 32-33). The court also observed that although it was only required to find clear and convincing evidence to support one statutory factor for termination under subsection (a), the evidence overwhelmingly established that termination was proper under Sections 2511(a)(1), (2), (5), (8), as well as under subsection (b). (*Id.* at 33).

The record supports the court's involuntary termination of Mother's

---

[4] A formal bonding evaluation was never completed because CYS was "never close to considering reunification" between Mother and Children. (*Id.* at 25). *See also In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (noting that Section 2511(b) does not require formal bonding evaluation).

parental rights under Section 2511(a)(1), (2), (5), (8) and (b).  Further, our independent review of the record confirms that there are no other non-frivolous issues.  **See Dempster, supra**; **Palm, supra**.  Accordingly, we affirm based on the Orphans' Court's opinion, and grant counsel's application to withdraw.

Decrees affirmed.  Petition to withdraw granted.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/14/2025

IN THE COURT OF COMMON PLEAS OF BERKS COUNTY, PENNSYLVANIA

ORPHANS' COURT DIVISION

IN RE: A.S., Jr. and Y.S.

FILE NO. 88819 & 88820

**MEMORANDUM OPINION**            **Jill M. Scheidt**            **August 30, 2024**

This matter came before the Court on a petition of Berks County Children and Youth Services ("BCCYS" or "the Agency") to involuntarily terminate the parental rights of Y.G. ("Mother") and A.S., Sr. ("Father") from their children A.S., Jr., ("A.S.") (born 11/15 ) and Y.S. ("Y.S.") (born 9/17 ), ("the Children") pursuant to Sections 2511(a)(1), (2), (5), and (8) of the Adoption Act, 23 Pa.C.S.A. §§ 2101 *et seq.* (the "Act").

The Agency filed for termination under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8) with the following concerns that led to the Children's placement originally: mental health concerns; inadequate housing and income; inappropriate physical discipline; inappropriate supervision; inability to meet the Children's medical and educational needs; and lack of appropriate parenting skills. The Final Decree determination is based on this Court's finding that several grounds for termination were established at the trial under 23 Pa.C.S.A. §§ 2511.

### PROCEDURAL HISTORY

On February 6, 2024, BCCYS filed Petitions for Involuntary Termination of Parental Rights relative to Mother and Father. Trial was held over two days: July 17, 2024 and August 19, 2024. This Court heard testimony from seventeen witnesses: sixteen BCCYS witnesses and

AUG 3 0 2024

Filed
Berks Co. Register of Wills/Clerk of Orphans' Court

Mother testified on her own behalf. Father did not appear for either day of trial. Both Mother and Father were represented by counsel.

## FINDINGS OF FACT

*A. Finding of Dependency*

Mother became known to BCCYS in 2013 due to concerns of a lack of appropriate parenting skills, domestic violence, drug and alcohol abuse and unstable housing as they related to her now teenage daughter who is not involved in the current action.[1] Furthermore, Mother has a history with BCCYS as a child starting at the age of five (5). She reported that she had resided in as many as fifty (50) foster homes throughout her childhood and was never adopted; her ten (10) siblings were all adopted. In addition, Mother reported that the reason for her placement was her own mother's substance abuse and selling of drugs.

On January 5, 2022, petitions for dependency[2] were filed alleging that the Children were without proper care or control, subsistence, education or other care necessary for their physical, mental, or emotional health, or morals. On January 19, 2022, BCCYS filed a Petition for Emergency Custody alleging that the Children were without proper care or control, subsistence, education or other care necessary for their physical, mental, or emotional health, or morals pursuant to *42 Pa. C.S. §6302 Definition of Dependent Child.*[3] BCCYS learned that Mother's then-paramour, F.M. ", had "kicked and choked" A.S. By Order dated

---

[1] Mother's oldest child, J.C., (born 4/0?) is seventeen (17) years old and currently resides in Georgia where she was permanently placed via an Interstate Compact Agreement.
[2] Exhibits 1, 2
[3] Exhibits 4, 5

2

AUG 3 0 2024

Filed_____
Berks Co. Register of Wills/Clerk of Orphans' Court

January 19, 2022 the Honorable Tina M. Boyd granted BCCYS emergency protective custody of the Children.[4]

Amended petitions for dependency were filed on January 21, 2022 alleging that "the petitioner avers that it would be contrary to the welfare, safety and health of the Children to remain under the care of *Y. G.,* Mother."[5] The amended petitions also included that the anticipated placement of the Children was Foster Care. By Order of Adjudication and Disposition, dated January 26, 2022, the Honorable Tina M. Boyd found that the Agency proved by clear and convincing evidence that the Children were Dependent Children due to a lack of proper care or control, subsistence, education as required by law, or other care or control necessary for their physical, mental, or emotional health, or morals.[6] Legal and physical custody were transferred to BCCYS. Mother and Father were present for that hearing. On January 26, 2022, Mother was court-ordered to participate in casework services and any recommendations, parenting education, mental health evaluation and any recommendations, domestic violence evaluation and any recommendations, drug and alcohol evaluation and any recommendations, establish and maintain stable and appropriate housing and income, keep BCCYS informed regarding any changes in residence or income, sign releases of information as requested, and visitation as scheduled and act in an appropriate manner. On January 26, 2022, Father was also ordered to participate in the same exact casework services and any recommendations with the exception of "visitation as scheduled and act in an appropriate manner."

On February 16, 2022, a status hearing was held in front of the Honorable Tina M. Boyd. Both parents were in attendance. Visitation with both Mother and Father was modified at this

---

[4] Exhibits 4, 5
[5] Exhibits 8, 9
[6] Exhibits 10, 11

3

Filed _____
AUG 3 0 2024
Berks Co. Register of Wills/Clerk of Orphans' Court

hearing. Mother was granted twice a week visits for two (2) hours, professionally supervised at the Signature Family Services ("SFS") office. Further, Mother was not to bring anyone to her visits. Father was granted visitations two (2) times per week for two-hour visits to occur at paternal grandmother's ("PGM") home but was to be professionally supervised.[7]

One of the concerns that led to the placement of the Children, and continues to exist, is Mother's choice of partners and her lack of honesty regarding those relationships with her BCCYS treatment team. When the Children were initially placed, she was residing with F. M. , who has a criminal history. F. M. participated in a Domestic Violence Evaluation with Stepping Stones Family Services ("SSFS") on March 3, 2022, upon the request of BCCYS.[8]

On March 14, 2022, the Honorable Tina M. Boyd issued an order which moved Father's visits into the Berks County Services Center due to PGM no longer being willing to allow visits to occur in her home.[9] A status hearing was held in front of the Honorable Tina M. Boyd on April 29, 2022. Mother was in attendance and Father was not. The Court ordered that Mother's visits be increased to twice a week for three (3) hours and be moved into Mother's home or the community and be professionally supervised. Father's visits were decreased to once a week for two (2) hours, professionally supervised.[10]

A regularly scheduled permanency review hearing was held on June 14, 2022, at which Mother was determined to be in full compliance with the permanency plan.[11] Father was only minimally compliant. Another permanency review hearing was held November 22, 2022 at

---

[7] Exhibits 12, 13
[8] Exhibit 60
[9] Exhibits 14, 15
[10] Exhibits 16, 17
[11] Exhibits 18, 19

4

which Mother was determined to be moderately compliant. Mother minimally provided random urine screens with Child and Family First and inconsistently attended drug/alcohol counseling with PA Counseling and was unsuccessfully discharged.[12] There was no compliance with the permanency plan as to Father.

In December 2022, the Agency learned that Mother was in a relationship with A.C.

. J.C. was scheduled to stay with Mother over the Christmas break. The Agency informed Mother that A.C. could not be in Mother's home because it had no information on him or time to run a background check. The Agency later learned that A.C. had just been released from prison. Mother eventually reported that A.C. was no longer residing with her because he went to a drug and alcohol rehabilitation program for his marijuana use.

A permanency review hearing was held May 15, 2023, at which time Mother was found to be moderately compliant and Father not compliant at all.[13] On May 19, 2023, the Court found that compelling reasons existed to not file petitions to terminate parental rights as it would not serve the needs and welfare of the Children, to wit, reunification with Mother was imminent.[14] A Status hearing was held in front of the Honorable Tina M. Boyd on July 26, 2023. Mother was in attendance[15] and Father was not. The Court assessed continued court-ordered services without changes.

A permanency review hearing was held October 11, 2023 at which time Mother was found to be moderately compliant and Father not compliant.[16] On December 11, 2023, BCCYS filed a Motion for Modification of Placement in regard to Y.S., as a kinship resource was

---

[12] Exhibits 20, 21
[13] Exhibits 22, 23
[14] Exhibits 24, 25
[15] Exhibits 26, 27
[16] Exhibits 28, 29

5

identified and presented as a long-term resource for Y.S.[17] On December 18, 2023, Mother, through her attorney, filed a Motion to Modify Placement in regard to both Y.S. and A.S,[18] Mother requesting that both Children be returned to her care. A hearing was held on January 3, 2024, at which time, the Honorable Tina M. Boyd ordered that upon A.S.'s discharge from KidsPeace, A.S. should be released into the legal and physical custody of Mother. The Court ordered that an appropriate plan be developed with A.S.'s treatment team for reunification. The treatment team felt that unsupervised contacts would be appropriate if reunification was going to occur. The Court also ordered that Y.S. be moved to the Kinship foster home.[19]

In January 2024, Mother admitted to being in a relationship with A. F. , who was residing with her. She had denied that he was residing with her until A. F. was found in her apartment during a spot check during one of her visitations.

On March 13, 2024, the Honorable Tina M. Boyd granted a Motion for Reconsideration of Reunification Plan filed by BCCYS on February 7, 2024.[20] The Reunification Plan set forth within the Court's Status Order dated January 3, 2024, was vacated. The Court required Mother to continue participating in all previously court-ordered services until she was successfully discharged. The Court also ordered that Mother participate in an Offending Parent Evaluation and attend supervised visits with the Children. At this time, A. F. was jointly presenting as a resource with Mother. On April 10, 2024, A. F. participated in an Adult Domestic Violence/Mental Health Evaluation with Commonwealth Clinical Group ("CCG") at the request of BCCYS. A. F. also has a criminal history.

---

[17] Exhibit 30
[18] Exhibit 31
[19] Exhibits 32, 33
[20] Exhibit 35

6

A.S. experienced significant trauma in his biological home, including sexual abuse at four (4) years old by another minor who was a family friend, witnessing domestic violence, exposure to drug use and inappropriate physical discipline inflicted on him and Y.S. A.S. struggled with regulating his emotions and behaviors in his foster homes, leading to his placement in KidsPeace's Diagnostic Treatment Program on January 24, 2023 for intensive behavioral health treatment where he remained until June 2024.[21]

Regularly scheduled Permanency Review Hearings occurred before the Honorable Tina M. Boyd on March 27, 2024, and April 24, 2024.[22] Mother was in attendance and Father was not. The Court found that Mother was in moderate compliance with the permanency plan and had made minimal progress towards alleviating the circumstances that necessitated placement. The Court found that Father was not in compliance with the permanency plan and had made no progress. Mother's visits with Y.S. were ordered to occur once a week for two (2) hours fully supervised at the Agency. A.S.'s visits were ordered to occur with Mother at least one (1-1/2) and half hours every other week while he was at KidsPeace. Upon his discharge from KidsPeace, visits were to occur weekly for two (2) hours fully supervised at the Agency.

Upon Mother's arrival at KidsPeace, she was to check-in and remain in the lobby for thirty (30) minutes prior to the Children's arrival. After Mother arrived for her visits, BCCYS would call A.S.'s and Y.S.'s foster mothers to bring them to KidsPeace. Mother found it difficult to wait in the lobby. Instead of following the rules, sometimes Mother would arrive very late or leave after check-in to smoke a cigarette outside or grab food for the Children. Mother was given a fifteen

---

[21] Exhibit 100
[22] Exhibits 36, 37, 38, 39

7

(15) minute grace period before the visit was canceled. Upon one such visit, Mother left after check-in to get pizza for the Children. BCCYS canceled the visit when Mother failed to return on time. After repeated requests to follow the rules, BCCYS changed its check-in procedure and had Mother check in an hour prior to the Children's arrival.

Y.S. does not look at his Mother as someone who is able to provide for him. In July, 2023, when he was aware of an upcoming court hearing in which he believed he may return to Mother's care, he appeared stressed and commented that he would no longer use lotion after his baths because "Mom Y. does not have lotion at her house." The day before court, his foster mother took him to the store and told him that he could get lotion and other items that he wanted to have if he was going to return to live with Mother. He picked out items for both himself and A.S., including washcloths, shampoo, conditioner, soap, curl cream, nail clippers, a "boo boo ice pack," toothbrush, toothpaste, lotion, and bandages. He also requested that the family buy food for him to have when he returned to Mother's house.[23]

The Children have not had any meaningful contact with their Father since April 24, 2022 and therefore have little bond with him at this time. Since the time of the Children's placement, Mother has resided at four addresses including

1. Mother

currently resides at

B. *Progress of Mother and Father*

The first BCCYS witness was Berks Counseling Associates psychologist, Dr. Laura Fritts. Dr. Fritts conducted an in-person psychological evaluation of Mother on February 23, 2022 and

---

[23] Exhibit 102

8

AUG 3 0 2024
Filed_____
Berks Co. Register of Wills/Clerk of Orphans' Court

March 23, 2022, using a Sixteen Personality Factor Questionnaire.[24] During the evaluation, Mother disclosed that her paramour at the time, F. M. had been disruptive in the home, frightening the Children, and being abusive towards her. She described an event in which she was fighting with F. M. over her C-Section pain medication, in which F. M. became angry, choked Mother until she urinated on herself and called her a "nasty bitch." Mother was also evaluated using a Parenting Stress Inventory, which is a hand-scored, self-report that shows how parents comprehend their own stress levels when parenting children. Mother scored higher than average on acting out. Rather than internalizing thoughts, feelings, perceptions, and experiences, such as anger and grief, she is more likely to act out behaviors and is seen as impulsive and emotionally reactive, not containing reactions to particular situations. Dr. Fritts reported that Mother had a tremendous amount of insight to her history, but it had not prevented her from making poor choices of boyfriends and Father, whom she chose to have children. Dr. Fritts said Mother expressed a lot of positivity towards her Children but that she minimizes the impact of domestic violence and does not think she is capable of getting out.

Dr. Fritts recommended that Mother find a therapist she trusts, has a connection with and makes her feel safe. She said Mother needs to make more informed and conscientious choices and find a job she appreciates.

On cross-examination, Dr. Fritts testified that the report was finalized two years ago and that circumstances and conditions may have changed. She was not aware that Mother is no longer in a relationship with F. M. and obtained a Protection from Abuse ("PFA") order against him. Dr. Fritts believes Mother did not take accountability for her Children's placement in foster

---

[24] Exhibit 50

9

Filed AUG 3 0 2024
Berks Co. Register of Wills/Clerk of Orphans' Court

care, Mother presented as a victim and indeed is a victim of her circumstances. Still, Mother chose violent partners. Dr. Fritts testified that based on the evidence, it was not safe to reunify Mother with the Children and she did not recommend a bonding evaluation. "Nothing is going to change," Dr. Fritts said. "We are looking at significant trauma."

Kaitlin Geiss, a BCCYS Intake Case Worker, testified next. Her role is to receive reports and investigate concerns in thirty (30) to sixty (60) days. The Agency received a general protective report for concerns of domestic violence, and her investigation of the                    family revealed that Father hit Mother. On November 1, 2021, first contact was made with the family. Ms. Geiss met with A.S. at school and interviewed him there. A.S. said he lived with Mother, "Dad" B. , and two siblings. He said B. would scream, grab, hit and argue with Mother a lot. Ms. Geiss testified that "Dad," B. is actually F. M. , and not A.S.'s biological Father. A.S. was interviewed again and he said Mother and F. M. were fighting with knives and Mother had a taser.

Ms. Geiss went to Mother's home to speak with F. M. on two occasions. On a November 4, 2021 visit, F. M. answered the door. He denied knowing Mother and threateningly told Ms. Geiss not to return. Ms. Geiss returned to Mother's home on November 8, 2021. Again, F. M. said Mother was not home and instructed Ms. Geiss to leave and not come back. F. M. had his right hand in his pocket which led Ms. Geiss to believe he had some sort of a weapon. The landlord witnessed this interaction, was concerned and pulled out his phone. Ms. Geiss thought the situation was dangerous and left. Ms. Geiss could not connect with Mother during these attempts.

After the first dependency petition was filed on January 5, 2022, Ms. Geiss made her first contact with Mother. The Children were taken into emergency custody January 19, 2022, and Ms.

10

Geiss was present with the help of the Reading Police. She noticed F. M. come out of the home, get into a car then go back into the apartment in what looked like a drug deal. She told the Police what she saw. The Police knocked on the door, Mother answered and F. M. fled out the back. Mother said to Ms. Geiss, "If I were my old self on the streets, I'd be attacking you." Mother also said the Children would not go with Ms. Geiss and that "kids get abused in foster care like I was." During the emergency placement, A.S. told Mother, "It's ok," and tried to calm her down. Mother ended up packing the Children enough clothing for two (2) days. Y.S. did not say anything until he got to the Agency when both Children said Mother and F. M. argue and fight all the time. Ms. Geiss's responsibility ended during the adjudication and the case was handed off to a placement worker.

Ms. Geiss went to Father's last known address, which was Paternal Grandfather's ("PGF") house. PGF was initially presented as a kinship resource but his house was not fully assessed, as he did not have beds for the Children. PGM was also considered as a kinship resource as the Children previously lived with her from January 24, 2022 until March 24, 2022. Father was not considered as a resource until he participated in court-ordered services.

Next, Cody Forsyth testified. Mr. Forsyth is the owner of Stepping Stones Family Services ("SSFS"). He provided a domestic violence evaluation for F. M. on March 3, 2022 and for Mother on March 4, 2022.[25] Mother was referred to SSFS after a report was made that F. M. "beats her up." Mr. Forsyth testified that Mother was forthcoming with her past relationships and that during a clinical interview he noted that Mother was guarded about the topic of relationships, provided little information, was not as expansive with communication and was measured in what

---

[25] Exhibits 49, 60

11

AUG 3 0 2024
Filed_____
Berks Co. Register of Wills/Clerk of Orphans' Court

she was saying. F. M. denied having physical altercations with Mother. When Mr. Forsyth asked F. M. if he thought the relationship with Mother was ending, F. M. responses reflected that he was less convinced as Mother that the relationship was ending.

On cross-examination, Mr. Forsyth agreed that things have changed since the evaluation and the report. He believes that Mother saw the emergency placement as a positive and that BCCYS took her Children because it was in their best interest. Mr. Forsyth added that any changes in Mother's circumstances could alter his recommendations, but it would be necessary to see her function in a healthy relationship.

Courtney Brensinger, a Therapist Intake Evaluator and Assessment Evaluator for CCG, testified next. On April 10, 2024, she provided a domestic violence/mental health evaluation of A. F. , Mother's former paramour.[26] A. F. was referred to CCG by state parole. It was apparent to Ms. Brensinger that A. F. did not take the evaluation and paperwork seriously. The paperwork had lines through it and zeros showing he was not answering honestly or even answering at all. Following his protective capacity assessment, Ms. Brensinger did not recommend him as a non-offending parent because he did not know the signs of child abuse and he said he would "whoop his own children's ass."

Ms. Brensinger testified about her concerns as to A. F. 's criminal background history which dates back to when he was fourteen (14) years old.[27] A. F. has a history of assaulting women but reported that his simple assault charges were simply mutual combat fights with the boyfriends of his "baby mothers."[28] Lehigh County Children and Youth Services took

---

[26] Exhibit 63
[27] Exhibit 64
[28] Exhibit 63

12

custody of A.F.'s children. Ms. Brensinger testified that she could not directly say that A.F. was a risk to the Children but she recommended supervised visits.

On cross-examination, Ms. Brensinger testified that she initially recommended A.F. focus on anger management with a focus on cognitive behavioral therapy and non-offending parent treatment. A.F. was previously seen by the Agency for treatment. He did not complete it because he completed his probationary sentence and stopped attending treatment.

Next, Angelica Farrisi testified. Ms. Farrisi is a Specialized Outpatient Therapist for CCG. She began treating Mother in June 2022 for eight (8) months. Mother was participating in CCG's "Alternative to Violence" individual treatment program and evaluation.[29] Ms. Farrisi testified that Mother's attendance started fairly strong then became sporadic due to changes in Mother's schedule. Mother changed jobs at least three (3) times during this treatment. The first evaluation was done September 30, 2022. During the evaluation, Mother talked about F.M. breaking into her car which affected her ability to get to work. Mother could not grasp the importance of getting a PFA at the time and did not see it as necessary. Ms. Farrisi had Mother complete two (2) workbooks to identify red flags in unhealthy relationships and learn coping skills. Ms. Farrisi's report indicated that Mother was continuing to present high-risk factors. Due to inconsistency in attending sessions, Mother was discharged April 18, 2023 and did not complete the program.[30] Ms. Farrisi's discharge email expressed concerns about a fight Mother had with her foster sister's paramour. The police were called and both Mother and her foster sister's paramour were cited for

---

[29] Exhibit 52
[30] Exhibit 53

13

harassment. At trial, Ms. Farrisi testified that she was not aware that Mother has not been in a relationship with F. M. for two (2) years and that Mother obtained a PFA against him.

Limarys Alvarez, a Specialized Outpatient Therapist with CCG, testified next. Ms. Alvarez received a referral from BCCYS for psychoeducational domestic violence treatment. Ms. Alvarez has been treating Mother since June 22, 2023. The Agency re-engaged services with Mother after she was discharged under Ms. Farrisi's care. Mother had to start over with the workbook. Mother's attendance at the beginning was inconsistent but attendance improved. Evaluations were done August 25, 2023, October 6, 2023, December 19, 2023, March 11, 2024 and April 30 2024.[31] Mother's progress showed that she was able to identify red flag situations. Treatment progress summary report concerns revealed that Mother failed to demonstrate an ability to establish stable housing for the Children. Mother found employment but still had issues paying rent due to limited hours and had to rely more on her paramour, A. F. , to help her afford housing. Ms. Alvarez testified that Mother disclosed the relationship with A. F. after he was discovered at the house during a visit around April 2024. During the evaluation, Mother said A. F. does not have much of a relationship with his own children and that is not much of her concern. Mother minimized her relationship with A. F. saying that the relationship is not the problem and that everyone is "against" the relationship. Mother finished the workbook in March 2024.

Ms. Alvarez testified about Mother's recent abuse against J.C. On April 29, 2023, during a heated argument, Mother hit J.C. in the head with a roller skate and punched and slapped her. Mother called police, who charged Mother with simple assault.[32] Mother pled guilty and was sentenced to two (2) years of probation. After an investigation, Child Protective Services found

---

[31] Exhibits 55, 56, 57, 58, 59
[32] Exhibit 69

14

AUG 3 0 2024
Filed_____
Berks Co. Register of Wills/Clerk of Orphans' Court

Mother to be a perpetrator of abuse.[33] Offending parent treatment was added to Mother's program. After the incident with J.C., Mother still did not see herself as being an offending parent.

On cross-examination, Ms. Alvarez testified that Mother was triggered by what J.C. was yelling during the fight and that it is concerning that her own daughter is a trigger. Mother does take accountability for the fight happening but says it happened one time, her daughter did not want to press charges and Mother is not an offender. "I'm not a child beater," said Mother. Ms. Alvarez testified that Mother is able to have some improvement but is "stuck," being unable to acknowledge her own cycle of abuse.

Najee Williams, a BCCYS Permanency Case Worker, testified next. She supervised Mother's visits with A.S. and supervised some of her visits with Y.S. During a July 1, 2024 visit at KidsPeace with the Children, the first hour went well.[34] They played games and watched movies. A.S. told Y.S. that he wanted to remain in his foster home. Y.S. told Mother that A.S. wanted to remain in foster care. Mother got defensive and minimized what they were saying. The Children said F.M. was hurting them and Mother did nothing. Mother responded with, "But you just said every time you were being hurt, I was at work." The Children were "trauma dumping" on Mother. Ms. Williams testified that Mother was speaking louder and getting agitated. Y.S. called Mother by her name " Y, " Mother said she wanted to end the visit, so it was cut short. A.S. tried to run out of the visit room and was yelling at Mother, "you don't want to talk you just want to argue." Ms. Williams grabbed A.S. and locked the door. Y.S. hugged Mother goodbye and A.S. begrudgingly gave Mother a side hug so she would leave. Ms. Williams started to walk Mother out and Mother yelled, "fuck you" and called Ms. Williams a "dumb bitch," while the Children

[33] Exhibit 3
[34] Exhibit 104

15

were within earshot. Ms. Williams testified that she did not feel that her own safety was threatened, but she was alone and more concerned about the Children.

On cross-examination, Ms. Williams described an October 30, 2023 visit with Mother and A.S.[35] Ms. Williams transported Mother to see A.S. at KidsPeace. Ms. Williams then drove Mother and A.S. to Taco Bell. A.S. said "what the fuck" in front of Mother who told him to watch his mouth. Ms. Williams said Mother would sometimes laugh or smile when A.S. cursed.

Next, David Caulker testified. Mr. Caulker is a SFS Caseworker. He was instructed by his supervisor to conduct random spot checks of Mother's home on weekends. On January 27, 2024, Mr. Caulker conducted a spot check and encountered A.F. in the home.[36] A.F. said Mother and A.S. were at Chuck E. Cheese. Mr. Caulker testified that A.F. said "I pay the bills here. I am tired of hiding and I'm going to stay in the house." On February 3, 2024, Mr. Caulker conducted another spot check at Mother's home at which time he encountered A.F., Mother, A.S. and J.C. Mr. Caulker informed them that he had to call his boss about what he saw and end Mother's visit with A.S. When BCCYS Caseworker, Ashley Frey, came to take A.S. back to KidsPeace, Mother became so angry that it upset A.S.

BCCYS Emergency Caseworker, Ashley Frey, testified next. On February 3, 2024, Ms. Frey was sent to Mother's house when A.F. was discovered there during A.S.'s visit. Ms. Frey testified that she asked Mother why she would have him there knowing she had spot checks. Mother started screaming and yelled at A.S. to get his "fucking shit." Mother said that the Agency said A.F. was a bad man. Mother told Ms. Frey, "I don't want to see your fucking face. I want your fucking face out of my house." Ms. Frey waited by the stairs and Mother continued to

---

[35] Exhibit 83
[36] Exhibit 79

16

scream, use obscenities and intentionally try to provoke a behavioral response from A.S. Mother also screamed at Ms. Frey, "fuck these niggas, shut your fucking mouth." Ms. Frey did not believe it was racially motivated and rather just an expression of Mother's anger. A.S. began crying and saying that he just wanted to be happy, to which Mother responded, "They don't want you to be happy, papi." A.S. was sobbing and visibly stressed by the situation. After Ms. Frey and A.S. went outside, A.S. asked if he was ever going to see his Mother again. Ms. Frey told him that adults have homework and his Mother has homework.

On cross-examination, Ms. Frey testified that she informed Mother that her boyfriend should not be there and Mother said "ok." Ms. Frey asked Mother if she understood why the visit was ending. Mother said she understood but is not sure why it was a problem since she gave all the information about A.F. to the caseworker a week prior.

Next, Dr. Alison Hill from Berks Counseling Associates testified. She conducted trauma evaluations on March 7, 2022 of both Children.[37] A.S. was six (6) years old at the time of this evaluation. Dr. Hill reported that he had trouble communicating, impaired comprehension, difficulty connecting with others and trouble paying attention. She diagnosed him with an Unspecified Trauma and Stressor-Related Disorder, just short of Post Traumatic Stress Disorder. Dr. Hill testified that she believes A.S. has been severely traumatized in the home and recommended play therapy to process experiences in Mother's home. She recommended continued supervision between A.S. and Mother, along with a bonding evaluation. Y.S. was four (4) years old during the evaluation and presented as being alert and oriented to his surroundings. Dr. Hill diagnosed him with Adjustment Disorder with Anxiety. Dr. Hill also recommended continued

---

[37] Exhibits 99, 101

17

supervision between Y.S. and Mother and a bonding evaluation. She testified that neither child should be in a home with domestic violence going on and that she is very concerned about the Children returning home to their Mother.

Caitlin Sheva testified next. Ms. Sheva is a Clinician at KidsPeace. She treated A.S. for eighteen (18) months and noticed A.S. display many sexualized behaviors, verbal and physical aggression. A.S. would masturbate with the bedroom door open, curse, hit staff and throw objects. It was reported that A.S. was sexually assaulted by older children he was spending time with during Mother's custodial time. A.S. was not given a roommate while at KidsPeace due to his behaviors. Ms. Sheva testified that A.S. made significant progress over a year and a half in which he was able to verbalize his feelings and emotions very well. A.S. was eventually given a roommate and although no significant sexual issues occurred, A.S. was putting his hand on his roommate's leg and sitting on his bed, which was not allowed. The roommate was removed after a couple of days.

Ms. Sheva testified that after a few unsupervised visits with Mother, A.S.'s behavior worsened, with an increase in his use of racial slurs, aggression and sexual behaviors. Upon his return from one of these visits, A.S. was drug tested because KidsPeace felt he was acting unlike his normal self. "He was looking around the room, would not answer questions about the visits, did not want to eat lunch and it was very abnormal for A.S.," Ms. Sheva testified. A.S. told staff that A.F. was living in the home but Mother said A.S. was not allowed to tell anybody or A.S. would not be allowed to return.

A.S.'s foster family planned a trip to Virginia, but Mother refused to give consent for A.S. to go. A.S. was upset, yelling and crying. Ms. Sheva told A.S. to take deep breaths and express his feelings to Mother. A.S. wanted to go on the trip but did not want to upset his Mother. Mother said no to the trip because she was trying to win him back. In Ms. Sheva's overall assessment, she

18

testified that A.S. made significant progress while at KidsPeace and was able to cope with stressful situations. She recommended ongoing therapeutic services for A.S. regardless of where he ends up.

Next, Tiffani Nagle testified. Ms. Nagle is a Specialized Outpatient Therapist with CCG. Ms. Nagle received a referral from BCCYS to conduct an offending parent evaluation for Mother. Her evaluation consisted of an in-person interview and self-assessment and was conducted April 12, 2024.[38] Ms. Nagle testified that during the evaluation, Mother talked about her April 29, 2023 assault of J.C. Mother said there was a fight and J.C. got "mouthy." Mother had asked J.C. for money and J.C. refused. Mother threw a roller skate at J.C.'s head leaving a mark on J.C.'s face. Mother called police and was arrested for simple assault. Following the incident, Mother admitted to physically assaulting J.C. as well as defended her actions by blaming J.C.'s attitude and stating that J.C. "deserved it." On July 31, 2023, the Honorable Thomas G. Parisi sentenced Mother to two (2) years of probation after a guilty plea.

Ms. Nagle felt like Mother did not think it was a big deal and Mother felt like she was being punished "twice" for it. During the evaluation, Mother shared details from her own emotional and sexual abuse in foster care. Mother reported that she witnessed domestic abuse as a child such as seeing her own mother fight with her boyfriends. In her overall assessment, Ms. Nagle testified that Mother opened up, was direct and being truthful, but Mother minimized the incident with J.C. Ms. Nagle testified that Mother said she should have walked away and thought it through longer. She regrets the incident with J.C. ever happened and knows she cannot go back and change it. Ms. Nagle recommended parenting classes for Mother.

---

[38] Exhibit 65

19

Filed _____ AUG 3 0 2024
Berks Co. Register of Wills/Clerk of Orphans' Court

Foster mother testified next. Foster Mother was A.S.'s foster mother for nine (9) months and was Y.S.'s foster mother for fifteen (15) months. This placement began May 3, 2022.[39] A.S. had behavioral issues that the family could no longer support, so they took him to the Reading Hospital, which resulted in his placement at KidsPeace. Foster mother testified that the Children talked to her about visits with their Mother. There was an incident in which the Children thought Mother's puppy was in the bed in Mother's room. The Children found a man instead of a puppy and he was not wearing pants. The man ran down the fire escape when he was discovered by the Children. During visits with Mother, A.S. played video games, Y.S. played with Mother or on Mother's phone. J.C. was there sometimes to play with them. Sometimes kittens and animals were around but the animals would be gone and the Children did not know what happened. Community visits started because Mother moved and her new residence would not accommodate visits. The Children looked forward to visits but Mother sometimes failed to show up for them. A.S. would have more problems than Y.S. when Mother failed to show up for visits. Foster mother had concerns about the Children's reactions when Mother had last minute cancellations. The Children had more anxiety going into visits about whether Mother would show up than the visits themselves, and they would blame themselves if she cancelled.

In an email from Foster mother to Ashley Esposito, Esq., Guardian Ad Litem and Legal Counsel for the Children, Foster mother expressed her concerns about Y.S.'s response regarding Mother's consistency in showing up for community visits.[40] On a few occasions, Y.S. would believe he was going to be returned to Mother. Y.S. said he was not going to use lotion anymore because Mother does not have lotion. He asked about clipping fingernails and cleaning his ears

---

[39] Exhibit 18
[40] Exhibit 102

20

AUG 3 0 2024

Filed_____
Berks Co. Register of Wills/Clerk of Orphans' Court

because he was not sure Mother would have the necessary items for grooming. ~~foster mother~~ testified that she took him to the dollar store to buy the personal hygiene items needed such as shampoo, conditioner, curl cream, toothpaste, toothbrushes and food, before visits with Mother. Y.S. was removed from ~~foster mother's~~ care because her family was not an adoptive resource. ~~Foster mother~~ continues playdates between her children and Y.S.

Next, Corrine Gebhart from Diakon Foster Care testified. In her role, she completes child profiles, creates written history biographies, conducts child prep services, talks about why children come into care and creates memories of families. She also conducts child-specific recruitment in which she searches for potential families. Ms. Gebhart began working with the Children in December 2023. She meets with the Children about every other week. She sees A.S. at KidsPeace and Y.S. in his resource family home. Ms. Gebhart testified about her conversations with the Children. Y.S. consistently would say he did not want to live with Mother but could never verbalize his reasons. Y.S. said he would like to be adopted by his resource family and see Mother when he is an adult.

A.S. formerly said he would like to live with Mother and Father. Around mid-July 2024, A.S. said he wanted to stay with his resource family because it was a calm and quiet home. A.S. did not want to discuss his recent visit. He was stressed and did not want to see Mother for a while. A.S.'s sexualized behavior has increased, engaging in sexual behaviors in the living room. He would yell, curse and say hurtful things to his resource family, such as he hated them and they were horrible people. Then he would calm down, seek affection and tell them he loved them.

Ashley Mellinger, BCCYS Supervisor in the Permanency Department, testified next. She testified that Father was initially presenting as a resource. He did one case session and started visitation but appeared more as a playmate than a parent. Father had no contact from March 2022

21

to October 2022. The following contact was sporadic. Father would appear at court hearings but not commit to any services after that. The Children lived with PGM five (5) days after coming into placement, receiving a temporary license, but then she decided not to proceed with full licensure. The Children were moved out of her home about two months later.

Ms. Mellinger testified that Mother appeared to be presenting as a resource with F. M. She had F. M. at her home when caseworkers were there and they appeared together at dependency hearings so it seemed like they were a couple.

Ms. Mellinger described events that took place during the 2022 Christmas holiday. Right before Christmas, Mother said she wanted her boyfriend, A. C. to be around during Christmas because he lives there and wanted to know if they could all be together. The Agency had to run clearances on A. C. since nobody had met him. The Agency asked Mother not to have him around or J.C. could not visit. Mother said he would not be there. The Agency knew him as ' and then ran his information and found his name. He has a long criminal history related to aggravated assault, simple assault, robbery, and criminal mischief charges. A. C. was irate when he learned he could not be in the home for the Christmas holiday.

J.C. spent that Christmas with Mother and then ran away. Her foster family returned to Georgia without her. J.C. was "on the run" and "gone" for almost thirty (30) days. Custody of J.C. was transferred back to Mother on March 1, 2023, as the Agency felt this option was better than J.C. being "on the run." J.C. attended school virtually, but things deteriorated around April 2023 when Mother assaulted J.C. and was arrested. J.C. asked to return to Georgia with her foster mother, who was coincidentally visiting relatives in Pennsylvania at the time. BCCYS took emergency custody and J.C. was placed with the foster family then returned to Georgia where she remains.

22

AUG 3 0 2024

Filed_____
Berks Co. Register of Wills/Clerk of Orphans' Court

Ms. Mellinger testified about Mother's support group who participated in family group planning on September 18, 2023.[41] Mother identified Ⱥ.Ⅎ. , her paternal Aunt, paternal Uncle and a paternal Cousin as her supports. Father was invited but did not attend. Ms. Mellinger reported lots of laughing, snickering and snide remarks. Mother would laugh or talk under her breath and say how something was stupid. Mother was minimizing the Agency's concerns.

Ms. Mellinger met with Mother August 6, 2024 and August 13, 2024. The August 13, 2024 meeting was about whether A.S. was decompensating in his current placement and to inform Mother that A.S. needed to move on to a new foster home. Mother said she has a brother in Pottstown that was ready to take the Children. When Mother was asked where this brother was the last three (3) years the Children have been in placements, Mother said, "In Pottstown, in his home, in his skin, the fuck." Mother also has an Aunt in Florida that was presenting as a resource but the process stalled because the Aunt had surgery.

Amara Zogas, BCCYS Permanency Caseworker testified next. She has been assigned to the case since February 2023. She testified that she attempted to serve Father a petition twice at his home and called and texted Father. She went to PGM's house in Bernville, Pennsylvania. Ms. Zogas had a conversation with Father around November 2023 to get permission to move Y.S. and Father gave permission. She let him know about the next hearing but he did not show. During their conversation, Father confirmed that he was receiving Ms. Zogas' calls and mail. Father last saw the Children April 2022.

Visits with A.S. and Y.S. at the beginning of case were through SFS, then visits were with Open Door at Mother's home on Elm Street. Mother was discharged from Open Door due to lack

---

[41] Exhibit 84

23

of availability with staff and changes in Mother's work schedule, causing disruptions in scheduled services. BCCYS had to find Agency volunteers to supervise Mother's visits. BCCYS Caseworker, Gabriella Morales, volunteered to supervise a few visits between Mother and Y.S. In a February 8, 2024 email to Ms. Zogas, Ms. Morales expressed that she did not feel she was the most appropriate person to supervise the visits.[42]

Ms. Zogas testified that A.S. wanted to take a break from visits, but Mother did not believe A.S. Mother said in an email that "...as far as A.S. he can feel how he wants he's still my son and my right is the ability to see him and I would like to see my son!"[43] Ms. Zogas described casework sessions with Mother. Sometimes she would not hear from Mother for weeks at a time. Mother would leave sessions upset. It was hard for Mother to take accountability for the incident with J.C. Mother minimized and blamed J.C. as if they were equals. Mother blamed Ms. Zogas and the spot checker because they did not clear A.F. quickly or at all.

Ms. Zogas testified about the Children's current progress with their resource families. Y.S. is doing "amazing" with his resource parents. He loves the individualized attention. Y.S. looks to them to meet his needs, is comfortable in the home, has toys, and is connected to the pets. He is now in the Wilson School District and is excited to go to school. He does not require any specialized services but is in weekly individualized therapy. A.S. was ready for discharge in 2023 but stayed at KidsPeace because the Agency could not find a home that was willing to take on a child with his behaviors. A.S. was with a family in June 2024 until mid-August. He did "amazing" in that home up until July 1, 2024 when the resource family saw a turning point in him such as masturbation, tantrums and aggression. A.S. started to decompensate at that time and the resource

---

[42] Exhibit 80
[43] Exhibit 105

24

AUG 3 0 2024
Filed_____
Berks Co. Register of Wills/Clerk of Orphans' Court

family wanted him out immediately. A.S. is currently with a family in Mohrsville, Pennsylvania. They are a permanent resource and are willing to adopt if A.S. is a good fit. The family has other children. Ms. Zogas does not believe terminating parental rights of Mother is a detriment.

Ms. Zogas spoke about the bond between Mother and the Children. The Children have said multiple times throughout the years that they love their Mother, want to protect their Mother, enjoy her company, but they struggle with the idea of their needs being met. Ms. Zogas testified that a bonding evaluation was never completed and that the Agency was never close to considering reunification between Mother and the Children even though visits continued.

This Court finds that the Agency witnesses testified credibly and were acting in the best interest of the Children.

Mother testified in her defense. Mother described the domestic violence she experienced in her childhood, around her own mother and in foster care. She saw her foster brothers and sisters fight frequently and stayed in relationships longer than she should have. She is not currently in therapy, despite the recommendation of Dr. Fritts. She entered the foster care system when she was five (5) years old and remained until she aged out. She was in over fifty (50) foster homes and was never adopted. All her siblings were adopted except her. She felt "unwanted" and "alone." Mother was emotionally and sexually abused as a child.

Mother testified that she completed all the requested evaluations by BCCYS. She learned to stay away from people, diffuse situations and walk away from violent situations. Mother broke up with F.M. who is in jail right now. She testified that she ended her relationship with A.F. around July 10, 2024 however, F.M. accompanied Mother to the first day of trial. This Court finds that Mother is not credible. BCCYS was drug testing her two (2) times

25

every week then every other week. Mother tested positive for fentanyl and alcohol in March 2022. She said it was because she did not wear gloves while working with a home healthcare aide patient who was prescribed fentanyl.

Mother's rent is $1,140 per month and she receives no rental assistance. She testified that it took a while to find her current home and that she takes care of everything herself. Through casework services, BCCYS staff attempted to help Mother to create a budget, but Mother had trouble saving money. Mother completed a course in cosmetology at Empire Beauty School but did not take the licensure test because she did not have the money to pay for it. She completed a Certified Nursing Assistant program in 2013 at the Social Security Building through a grant but did not sit for the exam because she did not have the money to pay for it. Last year she took a medical assistance program at Berks Technical Institute.

Ms. Mellinger's earlier testimony revealed that Mother's inconsistency with work played into Mother's inability to maintain housing and scheduled services. In March 2022 Mother was working nightshift at Palmer. In April 2022 she was working at the Comfort Inn. Then Mother was a home healthcare aide a few days after leaving the Comfort Inn. In October 2022 she was working at Holiday Inn Express and then by March 2023 she was unemployed and getting rental assistance. Mother has also worked at the Hilton Express Inn, Double Tree Hotel and Fairfield Inn and has sold her plasma to make money. Mother is currently working at the Courtyard Marriot "almost full-time," earning $13.00 per hour.[44] Mother told Ms. Mellinger she does not know why she keeps changing jobs. Mother continues to apply for many jobs using Indeed.

---

[44] Exhibit 105

26

AUG 3 0 2024
Filed_____
Berks Co. Register of Wills/Clerk of Orphans' Court

Mother testified about her visits with the Children. She said, "I bring food to every visit," and is always asking the Children how they are doing. She said her Children call her "Mom Y." because "they think it's ok to call foster moms, Mom." When asked why she did not offer her brother in Pottstown as a resource, Mother said she did not think he was of age because he is in his early twenties. She talked about her Aunt in Florida who adopted other children in the family. She said communication stalled between Pennsylvania and Florida to approve her Aunt and her Aunt was expected to provide an infant crib and Mother did not understand why, some time ago.

Mother testified that she feels BCCYS has placed obstacles on her when it comes to seeing the Children. An example she gave is when she is checked in for visits and she wants to have a cigarette or grab food because she does not want to wait in the lobby for an hour. Another example is when she said BCCYS let her son go on vacation with his foster family "behind my back."

On cross-examination, Mother was asked if she sought treatment for her Children after it was reported that they were sexually abused. Mother said she reported the abuse but that nothing was done since the perpetrators were only ten (10) years old. She said, "Everyone that needed to know knew about it."

Mother testified that she is receptive to therapy, wants it and asks for it. She agrees that the Children have been in foster care for about thirty-three (33) months. Mother says she does take accountability and that she is "still here." "I failed at protecting my children," she said, "I don't want them to end up in the same position I was in." Mother said Y.S. told her that his foster family said she is a "bad mom." Mother is open to therapy and ongoing services for the Children and herself.

AUG 3 0 2024

Filed_____

Berks Co. Register of Wills/Clerk of Orphans' Court

27

Despite Mother testifying on her own behalf, it is imperative to note that she was not able to provide credible testimony that undermined the evidence put forth by BCCYS in favor of terminating her parental rights. Mother's conduct throughout the time her Children have been in placement evidenced a disregard for the truth and an unhealthy contempt towards the Agency and their efforts to protect the Children. Mother has displayed a pattern of dishonesty. She has chosen multiple violent partners, some of whom abused the Children or her. Then she lied about those relationships. She engaged in fighting with her oldest Child, J.C., then sought to justify her conduct and the consequences, resulting in a determination that she is a perpetrator of child abuse and has a criminal record. Mother has failed to maintain stable housing and employment. She has failed to meet even their basic needs. Father has been largely absent for such a lengthy period of time to the point of evidencing abandonment of the Children in favor of terminating his parental rights.

## CONCLUSIONS OF LAW

The law is well settled that "[t]erminating the parental rights of the natural parent to his [or her] child carries with it a constitutional significance because of the importance of the rights involved." *T.J.B. v. E.C.*, 652 A.2d 936, 943 (Pa. Super. 1995) (*citing In re: J.W.*, 578 A.2d 952, 957 (Pa. Super. 1990)). "Consequently, clear and convincing evidence is necessary to prove the statutory grounds necessary to terminate parental rights." *Id.* In termination cases, the burden remains upon the Agency to prove by clear and convincing evidence that its asserted grounds for seeking termination are valid. *In re: J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003). The standard of clear and convincing evidence is defined as: testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re: Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994). A trial court must examine the individual circumstances of each case and consider all explanations

28

Filed AUG 3 0 2024
Berks Co. Register of Wills/Clerk of Orphans' Court

offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination. *J.L.C., supra.* When considering whether to terminate parental rights on the ground that the parent failed to perform parental duties for at least six months prior to the termination petition, a court should consider the entire background of the case and not simply mechanically apply the six-month statutory provision; the court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. 23 Pa.C.S.A. § 2511(a)(1); *see also In re: Z.P.*, 2010 PA Super 56, 994 A.2d 1108 (2010). Additionally, "[t]he Orphans' Court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re: M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004).

The Court applies a two-part test when determining whether parental rights should be terminated. *In re: L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Specifically, the *L.M.* Court stated as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (internal citations omitted).

Upon appellate review, the following standard shall be applied:

> [W]e repeat that appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the

29

Filed AUG 3 0 2024
Berks Co. Register of Wills/Clerk of Orphans' Court

findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

*In re: Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012) (citations omitted).

### Statutory Claims and the Best Interest of the Child

BCCYS proved by clear and convincing evidence that the rights of Mother and Father should be terminated under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8). This Court also finds that termination of their parental rights is in the best interest of the Children.

The language at subsection 2511(a)(1) provides that parental rights in regard to a child may be terminated on the grounds that a "parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."

Subsection (a)(2) provides that parental rights may be terminated on the grounds that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

Paragraph (a)(5) provides for termination of parental rights when a "child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy

30

AUG 3 0 2024
Filed_____
/ Berks Co. Register of Wills/Clerk of Orphans' Court

the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child."

Finally, subsection (a)(8) provides that parental rights may be terminated on the grounds that "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child."

Section 2511 further provides that, "[w]ith respect to any petition filed pursuant to (a)(1), (6), or (8), the Trial Court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). Importantly, "parental rights may not be preserved by waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities." *In re: D.J.S.*, 737 A.2d 23, 287 (Pa. Super. 1999). The long-standing law of the Commonwealth is that the inability of the parent(s) to perform parental duties makes him or her just as parentally unfit as a parent who refuses to perform these duties. *In re: B.L.W.*, 843 A.2d 380, 388 (Pa. Super. 2004).

Regardless of inability or refusal, once a parent demonstrates a failure to fulfill his or her parental duties,[45] the child's right to fulfillment of his or her potential in a permanent, healthy, safe environment with proper parenting supersedes the parent's basic constitutional right to custody and rearing of the child. *Id.* When terminating the parental rights of any parent, the trial court

---

[45] There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, our courts have held that that the parental obligation is a positive duty which requires affirmative performance. *In re: Adoption of A.C.*, 162 A.3d 1123, 1129 (Pa. Super. 2017).

31

AUG 3 0 2024
Filed_____
Berks Co. Register of Wills/Clerk of Orphans' Court

must give "primary consideration to the developmental, physical, and emotional needs and welfare of the [c]hildren." 23 Pa.C.S.A. § 2511(b).

This Court can appreciate that Mother appears to care for her Children and has demonstrated a nominal effort to comply with services. That said, given numerous opportunities, Mother has not shown that she has the ability – or sincere desire – to remedy the conditions which led to the removal of the Children in the first place. This Court seriously questions whether Mother can ever fully appreciate the needs of the Children. With regard to Mother, this Court acknowledges that Mother loves her Children and wants to care for them; however, this Court cannot ignore her long history of selecting violent men with which to be in relationships and her efforts to hide the relationships. Mother's inappropriate parenting, coupled with her ongoing toxic relationships with men clearly mitigates in favor of termination.

The emotional bond between the Children and Mother is virtually non-existent as the Children do not look to her to meet their needs. As for Father, the Children's bond is non-existent as they have no relationship whatsoever.

Mother became violent with J.C. while J.C. was in her custody. Mother behaved poorly during visits with the Children. She could not maintain stable housing or employment. Mother minimized the gravity of the high-risk behaviors in her relationships and her own trauma.

This Court fully credits the testimony of all sixteen BCCYS witnesses for their conclusion that the denial of termination would pose a further risk to the health and well-being of the Children. Aside from the myriad of other facts that have been discussed above warranting termination, Mother's refusal to take accountability for her actions is concerning. This Court also considers the fact that Mother testified on her own behalf. However, what she presented did not negate the

AUG 3 0 2024

Filed
Berks Co. Register of Wills/Clerk of Orphans' Court

32

overwhelming clear and convincing evidence presented by BCCYS in favor of terminating. Specifically, Mother failed to show that she is fit to parent the Children and that it was in the Children's best interest for Mother's parental rights to not be terminated. This Court considered all the testimony and finds that Mother clearly does not have the ability to provide a loving and stable home for the Children and has not remedied any of the conditions that led to the initial placement after being afforded more than two (2) years from placement until the Agency filed Petitions to terminate.

Although this Court recognizes that the Agency only needs to establish one of the statutory factors in order for the Court to terminate parental rights,[46] this Court finds that the evidence overwhelmingly establishes all of the elements of each of the relevant subsections in 23 Pa.C.S.A. § 2511. Further, the evidence shows that while Mother loves the Children, that is not enough to overcome other evidence presented in this case. What is in the best interest of these Children is outweighed by what little evidence was presented regarding the bond between Mother and Children.

BCCYS testimony revealed that Father's presence was sporadic throughout the almost three (3) years the Children have been in placement. Father would appear at court hearings but not commit to any services after that. When he did attend visits, he presented as a playmate rather than a parent. Father ignored several calls and emails from BCCYS Caseworkers and finally responded to a request to move Y.S. to a new placement, in which Father gave his permission. Father has not been in contact with the Children since April 2022. Father failed to even show interest in parenting

---

[46] *See In re J.E.*, 745 A.2d 1250 (Pa. Super. 2000).

AUG 3 0 2024

Filed_____

Berks Co. Register of Wills/Clerk of Orphans' Court

the Children and has shown that he is not fit to parent. It is in the Children's best interest for Father's parental rights to be terminated.

Moreover, this Court finds that the evidence clearly establishes that Y.S. is well-bonded with his resource parents and that his interest is best served by terminating the parental rights of both parents and opening Y.S. up for adoption. This Court also finds that the evidence clearly establishes that A.S.'s interest is best served by terminating the parental rights of both parents and opening A.S. up for adoption, as well.

**CONCLUSION**

Based on the aforementioned historical review and analysis, this Court finds that BCCYS has met its burden under Section 2511 of Title 23. This Court further finds that the best interests of the Children are served through the termination of parental rights of both parents.

8/30/24 , Certified
Copy of _A Memorandum Opinion_ issued to
Counsel of Record and/or Unrepresented
parties being C. Hahn & S. Quirk's
by first class mail by Register of Wills.
+ email          Lisa Hartline
+ inter-office : J. O'Neil + A. Esposito

BY THE COURT:

Jill M. Scheidt, J.